

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1719 | **DATE** | 4/22/2002 |
| **CASE TITLE** | Elbert Smith vs. First Union National Bank, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated above, the decision of the bankruptcy court is AFFIRMED in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | APR 2 4 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 8 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| TP | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
APR 2 4 2002

ELBERT SMITH, )
)
Plaintiff-Appellant, )
) No. 01 C 1719
v. )
) HONORABLE JOHN A. NORDBERG
FIRST UNION NATIONAL BANK and )
ASSURANCE MORTGAGE CORP., )
Defendant-Appellees. )

## MEMORANDUM OPINION AND ORDER

Plaintiff-Appellant Elbert Smith ("Smith") brought an adversary complaint in bankruptcy court against Defendant-Appellees First Union National Bank ("First Union") and Assurance Mortgage Corporation of America, n/k/a H&R Block Mortgage Corporation ("Assurance"). The bankruptcy court granted First Union's motion for summary judgment and dismissed the adversary complaint as to both Defendants. Smith appealed that decision to this court.

## BACKGROUND

The underlying facts of the case, which we largely draw from the bankruptcy court's opinion, are simple and essentially undisputed. Smith refinanced his home in July 1998 by entering into a mortgage with Assurance. The loan had a stated principal of $54,000 and a stated interest rate of 11.89%, with an annual percentage rate of 12.785%. Smith was charged approximately $3710 in underwriting, loan obligation, and processing fees; this represented approximately seven percent of the principal amount.

1

The loan between Smith and Assurance closed in July, 1998. At the time of closing, as a consequence of a tax sale that had occurred on 2/18/98, the property was subject to an outstanding tax lien for the 1996 tax year in the amount of $699.53. At closing, the prior mortgage was paid off and an escrow account was established to redeem the property from the tax sale. For reasons that are unclear, the title company did not actually redeem the property from the tax sale until January, 1999; at that time the tax liability had increased to $1366.19 due to interest and penalties. The title company apparently made up the difference between the amount originally escrowed for the tax lien and the amount actually required to redeem the property six months later.[1] The mortgage was ultimately assigned to First Union, the current holder of the mortgage.

Smith filed a Chapter 13 petition for bankruptcy on March 6, 2000. In his bankruptcy proceeding, Smith filed an adversary complaint against the Defendants. In Count I, directed against Assurance, Smith maintained that the loan violated the Illinois Interest Act, and that he was entitled to collect twice the total of all interest, discounts, and charges set forth in the loan agreement (approximately $325,000). In Count II, directed against First Union, Smith alleged that First Union is liable as Assurance's assignee and claimed a right of set off against the mortgage, with the net result that the mortgage is invalid. The gravamen of Smith's claim is that Illinois law makes it unlawful for a lender to charge points, service charges, discounts, commissions and other fees to the extent these total charges exceed 3% of the principal amount of the loan, if the loan has an interest rate in excess of 8%.

---

[1] Smith does not appear to assert that he or the lender had to provide any funds to cover the shortfall.

First Union moved for summary judgment on the grounds that the Illinois Interest Act had been preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1735f-7 ("DIDMCA"). The bankruptcy court granted First Union's motion for summary judgment and dismissed the adversary complaint against both Defendants. The Bankruptcy Judge rejected Plaintiff's contention that Illinois "opted out" of DIDMCA by reenacting the limitation on loan points in Section 4.1a of the Interest Act (815 ILCS 205/4.1a) in 1992. (Bankruptcy Transcript of January 22, 2001 ("BT") at 6-10). The court noted that the legislature enacted amendments to the provisions regarding late charges, which had no impact on the provisions addressing points, which were last amended in 1978. (BT at 6-7). The court concluded that a "legislature cannot be said to have adopted a provision of law when it merely repeats the provision in the course of adding a new provision to the same statute." (BT at 8). The court added that this result was consistent with the holdings of the district court and the firmly established Illinois rules of statutory construction. (BT at 8-9). The bankruptcy court also rejected Plaintiff's claim that DIDMCA does not apply to non-purchase money (refinance) mortgages. (BT at 10-12). The court concluded that the plain language of the statute and the weight of authority counseled against reading any such limitation into DIDMCA. (*Id.*) Lastly, the bankruptcy court rejected Plaintiff's contention that the mortgage was not a first lien for purposes of DIDMCA because of the outstanding tax lien. (BT at 12-13). The court concluded that "DIDMCA must be construed to distinguish between first mortgages and subsequent mortgages, not between mortgages subject to tax liens and those free of liens since there are no mortgages that are completely free of tax liens." (BT at 13).

Smith maintains that the bankruptcy court erred in granting judgment to the Defendants. Smith raises the same arguments that he did in the bankruptcy court: that the mortgage was not a first lien for purposes of DIDMCA because of the pre-existing tax lien and that, in any event, Illinois opted out of DIDMCA when it amended the Interest Act in 1992.

## LEGAL STANDARDS

### General Standard

In evaluating an appeal from a decision of the bankruptcy court, the district court reviews the factual findings of the bankruptcy court for clear error and reviews the bankruptcy court's conclusions of law de novo. *In re: United Homes of Michigan, Inc.*, No. 01cv8896, 2002 WL 126518, at *2 (N.D. Ill. Jan. 30, 2002). A district court will uphold a bankruptcy court's granting of summary judgment "'if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.'" *Id.* (internal quote omitted).

### Relevant Statutes & Regulations

Section 1735f-7. Exemption from State usury laws; applicability

> (a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under subchapter I or II of this chapter.

> (b) The provisions of subsection (a) of this section shall apply to loans, mortgages, or advances made or executed in any State until the effective date (after December 21, 1979) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance.

12 U.S.C.A § 1735f-7.

Section 590.2 Definitions

> For purposes of this part, the following definitions apply:
> (a) Loans mean any loans, mortgages, credit sales, or advances....
> (c) Loans which are secured by first liens on real estate means loans on the security of any instrument (whether a mortgage, deed of trust, or land contract) which makes the interest in real estate (whether in fee, or in a leasehold or sublease extending, or renewable, automatically or at the option of the holder or the lender, for a period of at least 5 years beyond the maturity of the loan) specific security for the payment of the obligation secured by the instrument: Provided, That the instrument is of such a nature that, in the event of default, the real estate described in the instrument could be subjected to the satisfaction of the obligation with the same priority as a first mortgage of a first deed of trust in the jurisdiction where the real estate is located....

12 C.F.R. § 590.2.

Section 590.3 Operation.

> (a) The provisions of the constitution or law of any state expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any Federally-related loan:
> (1) Made after March 31, 1980; and
> (2) Secured by a first lien on:
> (i) Residential real property;...
> (b) ...
> (3) At any time after the date of adoption of these regulations, any state may adopt a provision of law placing limitations on discount points or such other charges on any loan described in this part.
> (c) Nothing in this section preempts limitations in state laws on prepayment charges, attorneys' fees, late charges or other provisions designed to protect borrowers.

12 C.F.R. § 590.3.

Section 205/4.1a. Charges for items paid or incurred in connection with loans

> ...Where there is a charge in addition to the stated rate of interest payable directly or indirectly by the borrower and imposed directly or indirectly by the lender as consideration for the loan, or for or in connection with the loan of money, whether paid or payable by the borrower , the seller, or any other person on behalf of the borrower to the lender or to a third party, or for or in connection with the loan of money, other than hereinabove in this Section provided, whether denominated "points,""service charge,""discount,""commission," or otherwise, and without

regard to declining balances of principal which would result from any required or optional amortization of the principal of the loan, the rate of interest shall be calculated in the following manner:

The percentage of the principal amount of the loan represented by all such charges shall first be computed, which in the case of a loan with an interest rate in excess of 8% per annum secured by residential real estate, other than loans described in paragraphs (e) and (f) of Section 4, shall not exceed 3% of such principal amount. Said percentage shall then be divided by the number of years and fractions thereof of the period of the loan according to its stated maturity. The percentage thus obtained shall be added to the percentage of the stated annual rate of interest. ...

815 ILCS 205/4.1a.

## DISCUSSION

The key issue in this appeal is whether DIDMCA applies to the mortgage at hand. If it does, the case is over, as it is beyond dispute that DIDMCA preempts Illinois' points limitation. *See Currie v. Diamond Mortgage Corp.*, 859 F.2d 1538, 1542 (7th Cir. 1988). If it does not, the bankruptcy court's decision is in error. Plaintiff advances two arguments before us. First, that DIDMCA does not apply because the mortgage is not a "first lien," as the property was subject to an outstanding real estate tax lien. Second, that Illinois opted out of DIDMCA in 1992 when it reenacted its points limitation.[2]

### First Lien

Plaintiff argues that the mortgage is not a "first lien" for purposes of DIDMCA because of the pre-existing tax lien. Plaintiff maintains that because the tax lien was held by a tax sale purchaser, rather than the State, and the six month delay in paying off the taxes substantially

---

[2]Plaintiff appears to have abandoned his contention that DIDMCA only applies to purchase money mortgages. This concession is warranted, given the contrary authority. *See, e.g., Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907 (3rd Cir. 1990); *Gora v. Banc One Financial Services, Inc.*, No. 95 cv 2542, 1995 WL 613131 (N.D. Ill. Oct. 17, 1995).

6

increased the risk to the lender the mortgage was not a "first lien." We conclude that Plaintiff's argument is unpersuasive.

We first note that essentially all mortgages are subject to real estate tax liens. Thus, if the mere presence of a tax lien prevents a mortgage from being a first lien, DIDMCA has been effectively deleted from the U.S. Code. This, obviously, cannot be the case. Moreover, the relevant regulations appear to explicitly equate "first lien" with "first mortgage." *See* 12 C.F.R. § 590.2.

Acknowledging this difficulty, Smith concedes that the mere existence of a tax lien does not automatically prevent a first mortgage from qualifying as a "first lien." Nonetheless, Smith maintains that the sale of the tax obligation and the delay in satisfying the obligation resulted in significantly different circumstances than a typical mortgage, which warrant treating the mortgage at issue as something other than a first lien for purposes of DIDMCA. We must disagree.

The sale of the tax liability to a tax purchaser appears to be of limited consequence. Whether the tax liability is held by the State or a private purchaser, it still has priority over the mortgage. Therefore, if one looks from the perspective of priority, who holds the tax lien appears to make no difference. Moreover, in this case, the tax sale occurred prior to the closing of the mortgage, and provision was made to escrow funds to satisfy this obligation at closing. Smith appears to accept the proposition that if the tax lien had been satisfied as scheduled from the escrowed funds, the lien would have been extinguished just as it would have been if the State held the obligation. It appears odd that the identity of the holder of the tax lien was of no special consequence before/at closing, but suddenly takes on special significance afterwards.

The delay also appears to be inconsequential in this case. Smith asserts that some delay--for example, the three day period for disbursing the funds from closing--is not significant, but that the six month delay in this case was, as the amount necessary to redeem the tax lien approximately doubled. It is true that the cost to redeem the property doubled; however, it is also true that there was no real consequence for either the borrower or the lender, as the title company appears to have paid the excess. While Smith's argument that delay becomes significant at some point has intuitive appeal, any line that must be drawn, in the absence of a controlling statute or contract provision, should be based on practical consequences. In the absence of any impact on either party to this mortgage, the delay was of no significance.

In short, Smith appears to making artificial distinctions in an attempt to take advantage of an inconsequential administrative delay in satisfying the outstanding tax lien. While there may be cases where delay is so substantial and results in such significant consequences that a different result might be warranted, this is not such a case.

## Readoption of Illinois Points Limitation

Plaintiff argues that Illinois opted out of DIDMCA when it reenacted its points limitation in 1992.[3] Plaintiff argues that the legislature was specifically adopting the interpretation of the statute made by court in *Fidelity Financial Services Services, Inc v. Hicks*, 214 Ill. App.3d 398, 574 N.E.2d 15 (First Dist. 1991) and sought to remove all doubt as to the statute's validity. We reach the opposite conclusion.

The 1992 amendments to Section 205/4.1a added subparts (e) and (f) regarding late charges/dishonored checks, but otherwise left the rest of the statute, including the points

---

[3]The legislation was passed in 1991, but took effect in 1992.

8

limitation unchanged. *See* 815 ILCS 205/4.1a (Historical and Statutory notes). The general rule in Illinois, when part of a statute is amended and the rest remains as it was, is that "'[t]he portions of the amended section which are merely copied without change are not to be considered as repealed and again enacted, but to have been the law all along; and the new parts or the changed portions are not to be taken to have been the law at any time prior to the passage of the amended act....'" *Village of Park Forest v. Wojciechowski*, 29 Ill.2d 435, 438, 194 N.E.2d 346, 348 (1963)(internal quote omitted). The Illinois Supreme Court, while acknowledging the general rule, carved out an exception in *Davis v. City of Chicago*, 59 Ill.2d 439, 322 N.E.2d 29 (1975) for statutes subject to possible constitutional challenge. As the court put it, "we have an unusual situation involving a statute that may have been subject to successful constitutional challenge under the former constitution but has now been reenacted under the 1970 Constitution in which the provisions of the 1870 Constitution giving rise to the challenge do not appear." 59 Ill.2d at 444, 322 N.E.2d at 32. The court also noted that the enactment occurred in the wake of two cases which questioned the validity of the provision. *Id.* In these circumstances, the court concluded that the legislature's purpose in reenacting the provision with a minor change was to remove questions regarding its validity. *Id.*

Plaintiff argues that the *Davis* standard is met in this case, as the amendments at issue came in the wake of cases questioning the validity of the statute and the relatively minor changes to the statute raise a fair inference that the real purpose of the reenactment was to remove questions regarding the statute's validity. Plaintiff asserts two cases raised issues about the statute's validity, *Currie* and *Hicks*. In *Currie*, the Seventh Circuit, in an alternative holding, concluded that Section 4.1a of the Illinois Interest Act had been implicitly repealed by the 1981

9

amendment to Section 4. 859 F.2d at 1542-3. The *Hicks* court reached the opposite conclusion, noting that Seventh Circuit decisions are not binding on state courts, that the legislature would not have left a repealed statute on the books for a dozen years, and that Sections 4 and 4.1a can be harmonized. 214 Ill.App.3d at 401-4, 574 N.E.2d at 18-9. *See also Jackson v. Resolution GGF OY*, 136 F.3d 1130, 1131 (7th Cir. 1998)(acknowledging conflict between *Hicks* and *Currie*).

We note that the one district court to address this issue concluded that these amendments to the Illinois Interest Act did not result in Illinois opting out of DIDMCA by readopting its points limitation. *See Reed v. World Wide Financial Services, Inc.*, No. 98 cv 4294, 1998 WL 852854 (N.D. Ill. Nov. 27, 1998). The *Reed* court based its conclusion on the following: (1) that the legislature did not alter or amend the provision dealing with points; (2) that the rule in Illinois is that portions of an amended statute that are simply copied are deemed to have been the law all along; (3) that the Illinois appellate court decision addressing the Interest Act did not interpret it, but instead focused on the reach of DIDMCA; and (4) that the Illinois Attorney General opined in 1996 that the points provision was preempted by DIDMCA. *Id.* at * 3-4.

We also must conclude that Illinois did not opt out of DIDMCA by readopting the points limitation in the Illinois Interest Act in 1992. Significantly, *Davis* appears to carve out only a very narrow exception to the general rule. Moreover, *Davis* involved far more compelling circumstances, which included an amendment to the Illinois Constitution that was relevant to the statute at issue and significant controversy in the Illinois courts on the statute's validity. In addition, if *Currie's* alternative holding had created concern for the Illinois legislature, it is

unlikely that the legislature would have waited three years to act.[4] Further, the *Hick's* court affirmed rather than challenged the statute's validity. Lastly, as noted in *Reed*, it would be odd for the Illinois Attorney General to opine that DIDMCA preempted Section 4.1a in 1996, if the Illinois legislature had opted out of DIDMCA in 1992. 1998 WL 852854 at *4.

## CONCLUSION

For the reasons stated above, the decision of the bankruptcy court is AFFIRMED in its entirety.

ENTER:

JOHN A. NORDBERG
Senior United States District Judge

DATED: April 22, 2002

---

[4] We also note that the focus in *Jackson* was on whether a 1989 opinion letter from Illinois' Department of Financial Institutions, adopting *Currie*'s conclusion that 4.1a had been implicitly repealed, created a safe harbor for an alleged violator of Section 4.1a. 136 F.3d at 1132. If the 1992 amendments were viewed as explicitly reenacting the points limitation, the 1989 letter would have been of no consequence.

11